17616

Henry BROWN, Respondent, v. UNITED INSURANCE COMPANY, Appellant

(113 S. E. (2d) 26)

40

*Messrs. Watkins, Vandiver, Freeman & Kirven,* of Anderson, *for Appellant,*

*Marshall W. Abercrombie, Esq.,* of Laurens, *for Respondent,*

February 23, 1960.

LEGGE, Justice.

Action for alleged fraudulent breach and wrongful cancellation of a contract of insurance. The defendant, appealing from judgment entered upon a verdict for $291.20 actual, and $1,000.00 punitive, damages, charges that the trial judge erred in denying its motions for nonsuit, direction of verdict and judgment *n. o. v.*

The policy of insurance was issued on May 9, 1949, by Capital Life & Health Insurance Company, and thereafter appellant purchased the assets of that company and assumed its contractual obligations. In consideration of a weekly premium, payable in advance, of seventy cents, the policy provided for weekly "sick benefit" of $10.00, weekly "accident benefit" of $20.00, "natural death benefit" of $200.00, and "accidental death benefit" of $400.00; and, in addition, for payment for certain specific injuries, as follows: $100.00 for a broken arm or leg, or the loss of one eye, foot or hand; $200.00 for the loss of both eyes, feet or hands.

The complaint alleged that on or about May 1, 1957, the policy being in full force and the premiums having been paid through the first week of that month, the plaintiff filed with the defendant, as he had done on previous occasions, a claim for weekly sick benefit, together with the medical forms, executed by his doctor, as required by the policy; that the defendant's agent, knowing of the plaintiff's sickness and that the claim was a just one, falsely and with intent to deceive advised the plaintiff that he was not entitled to any benefits under said policy; and that after the claim had been filed, and while the defendant was indebted to the plaintiff on said claim, the defendant, deliberately ceasing its established custom of calling at the plaintiff's home to collect premiums, fraudulently cancelled the policy in order to deprive the plaintiff of the benefits to which he was entitled under the claim which he had filed, and of future benefits under the policy. Prayer was for judgment in the amount of $1,500.00, actual and punitive damages.

By its answer, the defendant, admitting the issuance of the policy by Capital, and its assumption of Capital's obligations thereunder, prayed reference to the policy for determination of all of its terms and conditions, alleged that it was cancelled because of the plaintiff's failure and refusal to pay the premiums, and denied the remaining allegations of the complaint.

The policy contained, among others, the following provisions:

"Par. 4. If premiums on this Policy become two or more Mondays in arrears, the policyholder hereunder will not be entitled to receive any benefits for accidental dismemberment, sickness or accident, beginning or occurring while premiums are so in arrears, and the subsequent payment of such arrears in full shall not entitle the Insured to benefits for dismemberment, sickness or accident occurring or existing during the two weeks after said premiums in arrears are paid in full.

"Par. 5. Weekly benefits for sickness will be paid for each period of seven consecutive days, while the Insured is totally disabled by sickness from performing or giving any attention whatever to his or her usual or other occupation; and necessarily confined to bed and there visited professionally by a duly licensed and practicing medical doctor. A Certificate must be furnished by the Insured signed by the doctor at the beginning of each week of such disability, setting forth the nature of illness and probable duration. The Company will furnish necessary blank forms for making claims, but if for any cause such blanks are not obtainable, the attending medical doctor may use his own form of certificate. There must be such actual attendance for every certificate filed. Liability for disability will begin to accrue for any week only when such certificate is received at the office of the Company * * *."

"Par. 10. Not more than ten weekly claims will be paid during any twelve successive months, and if as many as ten weeks benefits are paid during any twelve successive months

then no other disability benefits shall be payable until after the expiration of one year from the payment of the tenth claim paid during said period * * *."

Respondent, a field hand fifty-four years of age and with little education, testified as follows:

For some time after the policy was issued, he paid the premiums biweekly. Later, at the suggestion of the company's agent, he paid them by the month, *i. e.*, four weeks, in advance. Always the agent called at his home to make the collection. The last premium payment was made about the middle of April, 1957.

During 1956, respondent had undergone extended treatment for eye trouble, because of which he had, through his physicians, filed several claims for sick benefits, all of which had been duly paid. In April, 1957, as the result of infection following extraction of his wisdom teeth, he was laid up, and under the care of his physician, Dr. Rhame, for two weeks. On April 22, 1957, Dr. Rhame completed for him, and signed, on the company's form, a claim for sick benefits; and respondent sent it to the company's agent, Mr. McCarley. On this claim form, which was in evidence, it was stated over Dr. Rhame's signature that respondent had cellulitis of the mouth requiring his confinement to bed for a "few days", during which he would be totally disabled for work. On May 1, Mr. McCarley came to respondent's home and informed him that the claim had been rejected. To quote from respondent's testimony concerning that visit:

"Q. And what conversation did you have when he came back to see you, Henry? A. Well, he came back up, he said that they had refused to pay the blank, I believe he said that I had took up all my sick money. So I asked him how could that be. He said, 'Well, I don't understand it so well,' he says. 'Don't do anything about the insurance until we get it straightened out.' He said, 'We'll be back over here right away and straighten it out.' So nobody ever did return.

Q. Did you refuse to pay the premium? A. No, sir, I didn't pay because they owed me this sick claim and he told me just to wait until they got it straight."

Respondent testified that after his policy had been cancelled he had tried to obtain similar insurance from another company, but without success, as he could get only straight life, and no sick and accident, insurance.

Mr. I. C. McCarley, a former agent of appellant, who had left appellant's employ about June 1, 1957, was called as a witness by respondent, and testified as follows:

He had been in charge of the "route" that included respondent's residence, and was in charge of that route when respondent's claim for sick benefit in April, 1957, came into his hands. He turned the claim over to the manager, Mr. J. M. Austin. It was rejected and given back to McCarley, marked "Paid Out"; and he carried it to respondent at some time between its rejection and the middle of May, showed it to him, and explained to him that he was "drawn out". Although the witness testified that he had probably collected the last premium from respondent about the middle of April, he identified as having been made by him a notation on the claim card that the date of last collection was April 1, 1957. He testified that respondent paid his premiums for four weeks in advance, so that they were not in arrears when the claim for sick benefits was filed; and that when he visited respondent to inform him of the rejection of the claim and to collect the next premium payment the policy had not lapsed, although premiums may have been a week, or maybe two weeks, in arrears, the company's policy being to cancel on the Monday of the fifth week of arrears. (The insurance policy in evidence provides, Par. 9, that it shall become null and void "after premiums hereunder are four Mondays in arrears.")

Mr. McCarley further testified that on the occasion of this visit, respondent having insisted that he was not "drawn out", i. e., that he had not been paid ten claims during the

twelve-month period just past, and having stated that he would wait to pay his premium until the company got his claim "straightened out", he suggested to respondent that he wait, and told him that he (McCarley) would "try to get somebody out there to talk to him." This witness further testified that a month or so prior to the filing of respondent's claim, Mr. Austin went with him over his country route; that they made no calls, McCarley only pointing out to Austin the houses of the various policyholders; and that, following that trip, Mr. Austin had told him to "get the country business off the books". To quote from his testimony at this point:

"Q. What did that mean to you, Mr. McCarley? A. It meant, of course, a cut in my salary. I knew that.

Q. What did that mean to the policyholders? A. Well, it meant that they would lose their insurance.

Q. Lose their insurance? Well, why? A. Well, there were so many of them like—that couldn't get more insurance, that's all.

Q. You wouldn't go get the premium and just cancel them out, is that right? In other words, lots of them would be cancelled out because they failed to pay their premiums on account of you weren't going back, is that it? A. That's right. Yes, sir."

Mr. McCarley testified that when he went to see respondent following the rejection of his claim, he found respondent and his wife in the field in front of their house.

Appellant's only witness was its manager, Mr. J. M. Austin. He denied having ever told McCarley that he wanted him to get rid of the country business. He stated that he had several times accompanied McCarley on the latter's collection route; and that some time in May, 1957, in response to McCarley's request that he explain to the respondent why his claim had been rejected, he had gone with McCarley to respondent's house, but found no one at home. He testified that during the twelve-month period ended April 22, 1957,

respondent had filed six claims (including the one of April 22) for sick benefits, all of which were paid except the last one; that he had not told McCarley that respondent's claim was rejected because the sick benefits had been "paid out" or "drawn out"; and that the reason why he (Austin) rejected the claim was because "it didn't follow the policy contract", which stated that "it must be a bedside sickness or confinement"; and he stated that the policy had lapsed for nonpayment of premiums four weeks after April 22, 1957.

Mr. McCarley, recalled, stated that he had visited the respondent Brown when the April 22 claim was in process of being filed, and before the witness had actually received it; that respondent was in bed, his jaw was swollen, he was unable to speak, and the witness considered him very sick. He reiterated that he had understood from Mr. Austin that the claim was rejected because the sick benefits had been "drawn out".

There is nothing in the record before us indicating that appellant ever contended, prior to the trial, that respondent's claim of April 22, 1957, was rejected because he had not been, during the week following appellant's receipt of it, "totally disabled" and "necessarily confined to bed" within the requirement of Paragraph 5 of the policy before quoted. On the contrary, both the respondent and appellant's former agent McCarley testified that the only ground of rejection of which respondent had been apprised was that during the preceding twelve-month period he had been paid the full number of disability claim to which he was entitled, and that consequently his disability benefits had been exhausted or "drawn out".

The claim card in evidence bears appellant's stamp showing its receipt on April 23, 1957. Except for Mr. Austin's statement that the claim was rejected because respondent was not during the period covered by it (*i. e.*, the week April 22-28) totally disabled and confined to bed, the record discloses nothing to support that contention. That Mr. Austin found nobody at respondent's home when he made his only

visit there, in May, furnishes little or no factual basis for such contention, in the light of Dr. Rhame's statement on the claim card that respondent would be totally disabled for a "few days", respondent's testimony that he was "laid up" for two weeks, and Mr. McCarley's statement that when the claim was "in process of being filed" respondent was in bed and very sick.

If respondent was in fact disabled and confined, within the policy requirements, during the week April 22-28, appellant owed him, under its contract, $10.00, an amount more than sufficient to have paid the premiums for fourteen weeks; and, under the general rule stated in *Winchester v. United Insurance Co.*, 231 S. C. 462, 99 S. E. (2d) 28, would not have been justified during such period, in cancelling the policy for nonpayment of premiums.

That respondent had not exhausted his disability benefits appears to have been conceded at the trial by appellant's manager. The evidence to which we have referred furnished ample basis for the conclusion that appellant wrongfully cancelled the policy. We think, too, that it required submission to the jury of the issue of whether or not appellant, with knowledge that respondent's claim was a valid one and that it was indebted to him thereunder, but wishing to close out his policy as unprofitable, deliberately misled him into the belief that one of its agents would come back to him and straighten out his claim, his policy meanwhile continuing in force,—and thereby committed an act or acts of fraud in the breach of its contract. *Cf. Riley v. Life & Casualty Insurance Co. of Tenn.*, 184 S. C. 383, 192 S. E. 394; *Simmons v. Service Life & Health Ins. Co.*, 223 S. C. 407, 76 S. E. (2d) 288.

Appellant's final exception charges that the trial judge erred "in denying defendant's motion for judgment *n. o. v.*, there being insufficient evidence to support a verdict of two hundred ninety-one and 20/100 ($291.20) dollars actual damages for plaintiff and there being no competent evidence

to support a verdict of one thousand ($1,000.00) dollars punitive damages for the plaintiff."

This exception, so far as it relates to the verdict for punitive damages, presents for our consideration no issue as to the amount of that verdict; it charges only that the verdict lacks evidentiary support; and it is therefore disposed of by what has already been said.

So far as it suggests that the evidence was insufficient to support any verdict for actual damages, it is untenable for the reasons before stated. So far as it points to the amount of that verdict, appellant argues that by the measure of damages announced in *Pack v. Metropolitan Life Ins. Co.,* 178 S. C. 272, 182 S. E. 747, 749, respondent's recovery of actual damages is limited to the amount of premiums, allocable to the life insurance feature of the policy, paid by him up to, but not exceeding, $200.00. We do not agree with this contention.

The rule was thus stated in the *Pack case*:

"What is the measure of actual damages in such case? It is the sum of the premiums which have been paid by the insured, and loss (*sic*) by the lapse of the policy, and, the damage which the plaintiff has sustained by such lapse, to be ascertained, as for example, by ascertaining her life expectancy and the amount she would be required to pay for insurance of like character during such period, but such sum cannot equal the amount of the lapsed policy; and, of course, any special damages which plaintiff has suffered."

That the court did not intend, by its statement just quoted, to prescribe a precise and inflexible rule for computation of actual damages for breach of a policy of life insurance, even where no provision for sick benefits is involved, is plainly disclosed in *Rogers v. Jefferson Standard Life Ins. Co.,* 182 S. C. 51, 188 S. E. 432, the opinion in that case being written by Mr. Justice Bonham, who a year before had authored the opinion in the *Pack case.* The circuit decree in the *Rogers case,* reported with approval in the decision of

the appeal, was written by Judge Oxner, now a member of this court. In it, after review of cases in other jurisdictions and reference to the statement in the *Pack case* quoted above, he concluded that neither that rule nor any of the others that courts had from time to time applied was satisfactory in all circumstances, and that the measure of just compensation in any case must necessarily depend upon the circumstances of that case. The *Rogers case* was concerned with the breach of two policies of life insurance, each providing for a death benefit and containing the usual provisions for double indemnity and total and permanent disability. The judgment of the lower court, for actual damages, which this court affirmed, was the total of premiums paid, with interest, and less the amount of outstanding policy loans.

In *McLaughlin v. Brotherhood of R. R. Trainmen,* 216 S. C. 233, 57 S. E. (2d) 411, 414, Mr. Justice Oxner, speaking for a unanimous court, said:

"We have never undertaken to lay down an inflexible rule applicable to every situation. On the contrary, we have emphasized 'that the facts of each case are necessarily of potent influence in determining the measure of damages.' *Rogers v. Jefferson Standard Life Insurance Co.,* 182 S. C. 51, 188 S. E. 432, 434; *Hardee v. Penn Mutual Life Insurance Co.,* 215 S. C. 1, 53 S. E. (2d) 861. The nature of the insurance involved, whether the insured is any longer an insurable risk, whether similar insurance is another reputable company is available, and various other factors must be considered. * * * The dominant idea in formulating a rule of damages in any case should be the reimbursement of the insured for the actual loss sustained by him, and the measure of recovery which adheres most closely to that idea is the one that should be adopted."

And in *Winchester v. United Insurance Co.,* 231 S. C. 462, 99 S. E. (2d) 28, the court, again speaking through Mr. Justice Oxner, reiterated that the measure of damages for breach of an insurance contract must be determined from the facts of each case. In the *Winchester case,* an action for

wrongful cancellation of a policy which provided for surgical benefits according to a schedule therein set forth, and for accidental death benefit, where the insured had been compensated for a surgical operation on his foot and leg and there was no showing that he could not obtain a non-cancellable policy of the same kind, although there was testimony that such insurance could not be obtained without a rider excluding liability for claims arising from the injury to or disease of his foot and leg, we held that benefits to which he might have been entitled under the cancelled policy for surgery that he might have required in the future were too speculative for inclusion in his recovery.

The view whereby the insured is permitted to recover, by way of actual damages, the premiums which he has paid up to the time of the breach of the contract, together with interest thereon, is said to be a common one. Appleman, Insurance Law and Practice, Vol. 20, Section 11255. It would appear to suggest a groping toward the objective of just compensation, rather than a logical definition of a measure of damages by which that objective may assuredly be reached; for the loss which the insured has sustained and for which he is entitled to be compensated is, in reality, the value of the policy to him at the time of its breach, and that loss is prospective, not retrospective. If the value of a policy to the insured were simply the total of the premiums that he has paid for it, then it is manifest that he would not be entitled to claim damages for its breach at any time, because at the time of the breach he would already have received that for which he had paid. The valuable thing of which he has been deprived by its breach is protection not in the past, but in the future. And the value of such protection is necessarily dependent upon many factors, varying with the facts of each case, and thus rendering impossible reduction of that value to an exact number of dollars and cents. Among those factors evident in the case before us are: the non-cancellability of the policy; its provisions for weekly benefits in case of temporarily disabling illness; the insured's

age and the state of his health; and the unavailability of similar insurance. As to the last of these, respondent's testimony is strengthened by that of appellant's manager, Mr. Austin, who stated that appellant has discontinued writing such policies.

Whether or not the insured might ever again suffer an illness that would have entitled him to sick benefits under the provisions of such a policy is a matter that of course cannot be determined with certainty; but such uncertainty does not render valueless the protection that those provisions afforded him. That element of damage, while in some degree necessarily speculative, is not to be rejected for that reason; it should be considered in the light of pertinent circumstances disclosed by the evidence, such as the insured's health and life expectancy. It is simply one of the factors illustrative of the impossibility of determining, precisely, the amount of money that will effect just compensation in such cases.

In the case at bar the trial judge charged the jury as to actual damages in the most general terms, suggesting no formula for measuring such damages. After his main charge he recalled the jury and charged, in addition, that if they should find that the plaintiff, after the cancellation of his policy, had been unable to obtain similar insurance elsewhere they could take that fact into consideration as an element of damage. No amplification of his charge appears to have been requested.

It is apparent that the verdict for actual damages, $291.20, is exactly equal in amount to the sum of the weekly premiums paid by respondent during the eight years throughout which the policy had been in force prior to its cancellation. The exception under consideration does not complain of error in the trial judge's charge; it does not suggest that the verdict for actual damages was improper because contrary to the law as charged (cf. *Hutcherson v. Pilgrim Health & Life Ins. Co.,* 227 S. C. 239, 87 S. E. (2d) 685); it does not suggest that the amount of the verdict is so ex-

cessive as to indicate passion, prejudice or other corrupt motive on the part of the jury; it assigns no ground for its assertion that there was "insufficient evidence to support" the verdict. In our opinion it is without merit, and it is therefore overruled.

Affirmed.

STUKES, C. J., and TAYLOR, OXNER and Moss, JJ., concur.